You're welcome. Case numbers 14-2274 and 14-2275. United States of America and the Sierra Club v. DTE Energy Company et al. Argument not to exceed 15 minutes to be shared by the plaintiff and intervening plaintiff and 15 minutes for the defendants. Mr. Benson, you may proceed for the appellant. May it please the court, Thomas Benson for the United States. Your honors, this court's prior opinion held that a pre-construction projection is subject to enforcement action to ensure that the projection is made pursuant to the requirements of the regulation. Now, quite simply, DTE fails to comply with the regulations here, so enforcement is appropriate. Most critically, the company did not follow the rules for the demand growth exclusion. And those rules say that you can only use the demand growth exclusion if there are two requirements. One of the critical requirements is that your predicted emissions are unrelated to the project. Here, by contrast, DTE predicted a huge emissions increase, about 4,000 tons each of sulfur dioxide and nitrogen oxide. DTE's own analysis shows that much of that increase was related to the project, and they excluded the entire increase. When we asked why in discovery, they said it was based on the belief that projects like this cannot increase emissions. Now, that's a legal opinion, and it's wrong as a matter of law. Here at summary judgment, the court must treat as true our evidence showing that DTE's own analysis shows an increase related to the project. And that means that the project was a major modification at the time of construction. The law on this is clear. Six appellate courts have all found that where a source should have gotten a pre-construction permit, the project is a major modification at the time of construction. And those courts have all found that that reading is compelled by the statutory language itself. And this court's prior opinion found the same thing, that the pre-construction projection determines the major modification status, the first page of the prior opinion. Now, DTE responds that pre-construction applicability is entirely up to the source. But as this court explained, if EPA cannot enforce against projections that fail to follow the rules, new source review would cease to be a pre-construction review program. The United States simply asks to proceed to trial to prove what DTE should have expected and actually did expect at the time of construction was an increase related to the project, and thus that the project was a major modification at that time. Now, Your Honors, my plan is to use my remaining time on three points. First, why this action is not second-guessing under the prior opinion. Second, the appropriate standard for determining major modification status. And third, why DTE is incorrect that certain aspects of the rule are unenforceable. So turning to second-guessing, the prior holding was that EPA can enforce where sources fail to follow the regulations. This court explained a couple things that are critical here. First, that the system is not working or a source fails to project at all or a source deviates from the rules. And if a source in that circumstance proceeds to construction, this court explained that it's subject to enforcement. And that makes clear that it's not second-guessing to enforce where a source fails to follow the rules. Here, DTE failed to follow the regulations, that's equivalent to no projection at all, and there's simply nothing to second-guess. So in that circumstance, the question becomes, had DTE followed the rules, would they have expected an emissions increase? And that's the standard that each court to consider the issue has used in assessing liability. The Alabama Power Court that we cite in the brief is the latest example of that series of cases. And that standard is perfectly consistent with this court's prior opinion. This court phrased the standard as whether the source made its projection pursuant to the requirements of the regulation. Now, the regulations require a projection based on all relevant information, and it's implicit that that projection must be reasonable. Otherwise, the regulations which lay out in detail how to do a projection are simply wasted space. Now I'm going to turn to the enforceability of the demand growth exclusion. DTE argues that the application of the demand growth exclusion rests entirely with the source's judgment. And their theory is that EPA didn't prescribe exactly how to perform the demand growth analysis and so left it implicitly to the source. Now, that's wrong as a matter of law. First, the regulations do say how to apply the demand growth exclusion. There's two parts to it. You can only exclude emissions that the unit was capable of accommodating before the project and are unrelated to the project. Second, it's an established principle of law that enforcement cannot be defeated on the ground that the agency failed to put forth a more specific regulation. And that's this court's Cinemark case. Third, this court in the prior opinion included the demand growth exclusion as part of the enforceable requirements of the regulation. And finally, when the D.C. Circuit upheld the demand growth exclusion in the New York v. EPA case, that court relied in part on finding that there was no per se exclusion of demand growth. And DTE's argument here is just another flavor of a per se exclusion for demand growth because in their argument, all the source has to do is claim demand and it's excluded. That can't be right. And critically, DTE's argument doesn't just go to pre-construction applicability because the demand growth exclusion also applies to applicability based on post-construction data. So even if there was an increase in pollution after the project, the source could claim it was the result of demand. And DTE regularly does exactly that. We've seen that in the other claims that the United States and the Sierra Club have brought that are currently pending before the district court. Counsel, this is Judge Rogers. Under your reading of our previous opinion, it sounds like we could look at virtually any argument that says that the regulation wasn't complied with, such as failure to explain or not take into account all the different factors. I just wonder how consistent that is with the tenor of the previous opinion, which suggested that this is supposed to be sort of a basic look to see whether the basic requirements have been gone through. Your Honor, I think this is a much easier case because in this case, Detroit Edison, their own analysis shows that they are excluding emissions that are unrelated to the project. And if that's the case, the demand growth exclusion cannot be invoked, and that's exactly what they did here. And at summary judgment, the court has to take as true our evidence that their own analysis shows an increase related to the project. So what's the answer to my question, though? I think the answer to your question is there may be a harder case out there, Your Honor. The next case may be harder. Like what? Like what? I'm sorry, Your Honor, I didn't catch the last part of that. Like what? It's hard for me to think of one now. If you take the arguments that you're making, it seems like I don't know what would be left to challenge the exclusion or to challenge the projection. Those are all the bases that you would normally challenge it. It sounds like a regular, full-fledged review of the determination. I grant you that our standard may not have been crystal clear, but we were trying to figure out a way in which the process could go forward without turning it into a full-fledged pre-activity projection review. But the way you're describing it, the arguments you're making seem to have characteristics of a full pre-project review. Your Honor, I don't think that's where this is going. We take to heart the court's admonition that there is no prior approval under the New Source Review Program, and we agree. There's no prior approval here. But whenever you identify the need for a prior approval, they better do it completely and they better get it approved by you or they may not get it approved by the court. Well, Your Honor, the source has the ability to go forward, so there's no prior approval. And for 99% of the projects, there's not going to be a problem. In the rare case where a source's projection does not comply with the rules, EPA can step in, and I think that's the holding of the prior opinion, and I think the prior opinion distinguishes between EPA being able to step in if a source deviates from the rules and sets that aside from second guessing. And so here we have identified a clear deviation from the rules. DT did not follow the rules. That's what our evidence shows. What would be the difference between the standard that you would apply if there were before the fact review and the standard that you're saying applies here? Does my question make sense? I'm not sure I understand the question, Your Honor. I'm sorry. If we said that there's not supposed to be an approval process before the project goes forward, right, that's what we said? It doesn't need to be, right? And the idea was that in some sort of basic way, you had to go through the effort of making a projection and complying with the basic requirements of the rules to make the projection, but we're not going to require that it be reviewed with the same degree it would be required if there were prior review, what we were rejecting. But now I guess I'm asking for some daylight between what you're advocating that we look at now and what we were rejecting in the previous opinion. And you just say, well, we don't have to worry about it, but I'm still worried about it. I'm not trying to say we don't have to worry about it, Your Honor, because I appreciate that that's the court's concern. I think the distinction is if a source hasn't followed the regulations, then, as this court says, this court has essentially equated failure to project with failure to follow the regulations. In either case, there's nothing to second-guess there. And so here the source didn't follow the regulations. You can see that based on their own analysis. And so there's nothing to second-guess here. Time has expired, just to let you know. Thank you. Thank you, Your Honor. Ms. Whittle. May it please the court, I would like to talk about two things. Number one, there is nothing to second-guess here. DTE simply did not do the required analysis. And number two, this is still a live controversy. DTE pushed off putting on the required pollution equipment for years, resulting in hospitalizations and deaths that could have been avoided if DTE had followed the rules. On the issue of second-guessing, instead of following the rules, DTE simply assumed that all of its projected annual post-construction emissions could be disregarded on the basis of demand growth. At virtually the same time, DTE was telling the Michigan Public Service Commission that it expected demand to decline on its system. But DTE wants the court to ignore this blatant inconsistency and defer to what DTE claims was an exercise of engineering judgment. This isn't about a battle of the experts or a fight over how much to weigh certain factors. There is nothing here to second-guess. DTE failed to undertake the required analysis in order to take advantage of the demand growth exclusion. This is DTE's pattern and practice. For DTE, the demand growth exclusion will swallow whatever emissions increases follow up a construction project every time. And the emissions increases we are talking about aren't small. DTE wiped away a huge amount of pollution, not just a portion of the expected increases, but all, with no analysis contrary to the rules. On the issue of why this matters and what we are asking for, DTE has a pattern and practice of misusing the demand growth exclusion. The complaint before the district court has six additional claims with the same general factual scenario, except emissions have all gone up post-construction. If its violation of the regulations isn't reviewable, then DTE will continue to overhaul its aging coal units without the necessary review and permitting. In this case, DTE successfully pushed off installing the necessary pollution controls for four more years. Each year represents 90 premature deaths and total social costs of $500 million. If DTE had installed controls when it was supposed to in 2010, they would have eliminated about 8,000 tons of nitrogen oxides and 26,500 tons of sulfur dioxide pollution each year. And the remedy isn't simply redoing the projection. The remedy in the usual case would be to require new source review and permitting. Here the remedy is a civil penalty and mitigation projects to address the air pollution DTE caused. Thank you for your time. Thank you. Mr. Brunel, you may proceed. Thank you. May it please the court, this is William Brunel on behalf of DTE Energy. Let me start by noting that there are three key points that are not in dispute. First, on row two, emissions have decreased in each of the five years following the project. Second, as this court observed in its earlier decision, the company performed the emission calculations and filed a pre-project emissions notice that was timely and sufficient. And let me stop there to comment on the point that was made in the earlier argument, the allegation that DTE did not perform the required analysis. The district court found that the pre-project notice that DTE filed contained a table with all relevant calculations and the required specificity. That notice letter, which appears at docket number ECF 166-3, attachment two, that pre-project notice letter explained that these relevant calculations were produced using PROMOD, a sophisticated model analysis, contained in a report filed with the Public Utility Commission called the 2010 Power Supply Cost Recovery Annual Report that contained the analysis that led to those projections. Now, those projections projected for each of five years after the project. In four of those years, they projected a decrease. In one of those years, they projected an increase. For that one year, DTE explained in the pre-project notice that we excluded, as we are required to do by the regulation, from the PROMOD projections that portion that the unit was capable of accommodating and that were unrelated to the projects. It included the information with respect to what the unit was capable of accommodating during the baseline period and explained that the projected increase was unrelated because emissions and operations fluctuate year to year in response to a variety of factors other than the project. Then, in response to requests for further information from EPA, DTE provided two additional letters with additional explanation, which appear at docket ECF number 166-3, attachments 3 and 4. And in that additional explanation of these calculations, DTE explained that the projected increase in 2013 was due to then expected increased demand on the unit as a result of myriad factors, most importantly, an extended outage at companion unit Monroe-1 in order to tie in advanced pollution control equipment on that unit. Because Monroe-1 was going to be offline and not generating for a significant portion of time during 2013, Monroe-2 had to pick up that generation, hence the projection of more operation and more emissions, not because of the project, but because of the outage schedule. Then the company further explained that we ran this sophisticated model again in 2011 and we had run it in 2009, both with the project, and in both of those sets of runs we projected no increase in 2013 because other assumptions had changed, including fuel prices, relative oil, gas, and coal fuel prices. So there was sophisticated analysis and reporting and explanation of why DTE was using the demand growth exclusion as it was required to by the rules. And that leads me to the third point as to which there is no dispute. As the government says at pages 12 and 13 of its brief, the emission projections in DTE's notice were based on sophisticated computer modeling using exhaustive inputs, and those exhaustive inputs included things like future outage rates, coal prices, demand, and many other factors, as the government recognizes. The government's only dispute with the company is that the company should have exercised its judgment differently to make an emission projection that contradicts reality. The district court correctly found that there is nothing in the specific instructions of the regulations that dictate that a company make projections that defy reality. Now, in deciding the case below, the district court explained that its instructions on remand were to determine whether the company complied with projection regulations, and in doing that, the district court reviewed the projection regulations and explained that EPA does not contend that the company violated any of these regulations. Rather, they dispute the extent to which the company relied on the demand growth exclusion. That, the court found, is second-guessing, which is prohibited under this court's earlier decision. Now, the government says first that DTE did not consider all relevant information in making its projection, but that was the purpose of the sophisticated computer modeling and the exhaustive inputs used by DTE in making those projections. Second, the government says that the company improperly excluded from its projections emissions increases that were related to the project. But as the district court found, and as everyone has to concede, the company specifically addressed the causation element of the projection regulations, that is, the demand growth exclusion, and as those regulations require, it exercised its engineering judgment to exclude emissions that the unit was capable of accommodating during the baseline period and that were unrelated to the change. This rule says the operator shall exclude emissions that the unit was capable of accommodating and that are unrelated to the change. That's exactly what DTE did based on its sophisticated computer modeling and exhaustive inputs. Projections of the future are by definition uncertain, and that's the reason for the reasonable possibility rule. A causation determination requires the exercise of judgment, which, if second-guessed, would turn this program into the prior approval program that this court rejected. And of course, the company's projections are now verifiably accurate. The only correct projection now is one that conforms with reality, and that reality is that emissions did not increase after the project, due to the project, and in fact emissions did not increase for any reason. They decreased, and they've decreased significantly. So in sum, the district court properly found, based on undisputed facts, that the company's projection complied with the specific instructions of the regulation and its decision should be upheld. I'll conclude my remarks there unless the court has questions. No. I have none. I have none. Thank you, Your Honors. All right. Mr. Benson, you may proceed with your rebuttal. Yes. Thank you, Your Honors. A couple points here. First, we have a clear dispute of facts. You can see it in Mr. Brownell's statement. I think there's no doubt. Our facts say that Detroit Edison's analysis shows an increase related to the project, and here is summary judgment that can't be tossed aside. I want to take issue with one thing Mr. Brownell said. He said that DTE's projection only shows one year of increase. That's not correct. And if you look at page ID 183, which is document 8-9 in the record, DTE produced to us output from its own modeling, and if you look, for instance, at the SO2 numbers, they show an increase from the baseline in 2011, 2012, and 2013. All of this is to say is there is a dispute of facts here. Now, Mr. Brownell talks about DTE's engineering judgment, but what they rely on for their engineering judgment in this case is a declaration from Company Vice President Skiles Boyd. Now, Skiles Boyd in his deposition said that he had no personal knowledge of the NSR analysis in this case, and that's docket number 115-4. I don't have a page ID because it was submitted under seal because DTE said it included confidential information, but it's there. It's in the record. The broader point here is if a source can evade new source review simply by saying that the rules don't apply then you no longer have a pre-construction review program, and that's exactly what DTE is saying here, that as long as they can come up with a declaration from anybody in the company that says we looked at this, we applied engineering judgment, and we didn't think new source review applied, then they get a free pass from the program, and if that's the case, then there simply isn't any rigor to new source review. This court found that without the possibility of EPA enforcement, new source review would no longer be a pre-construction review program, and this court held that EPA could enforce based on pre-construction analysis, and for that to happen we need to be able to move forward on a case like this where DTE is simply saying on their own say-so that NSR doesn't apply. One final point, the actual emissions are not dispositive here, particularly in this case, because the dispute is about whether DTE's projected emissions increase was related to the project. That's something that is inherent in their projection itself. They did computer modeling. They baked in the effect of the project, and they showed an increase, and excluding that increase in its entirety was a violation of the rules in March of 2010 when it was done. The fact that emissions went down after the project don't show that the projection DTE made before the project don't show that that projected increase in emissions was unrelated to the project. Unless there are any questions, I have nothing further to add. Thank you, counsel. The case will be submitted. Counsel, you may hang up at this time.